UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HENLEY GROUP, INC. | )<br>)<br>) |
| Plaintiff, | )  CASE NO.<br>) |
| v. | )<br>) |
| A&C VENTURES, INC.,<br>HD WESTMINSTER, LLC,<br>ATT AVON LLC, and<br>DAVID R. GRIEVE. | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

### INTRODUCTION

Plaintiff The Henley Group, Inc. ("Henley") seeks damages suffered as a result of defendants' bad faith breach of an agreement to pay Henley a success fee earned as the result of a completed business transaction, which netted the defendants over $3.55 million.  As detailed herein, defendants not only reneged on the deal, but also stole Henley's plan and implemented it alone as a maneuver to try and avoid Henley's right to be paid.  As a result of this malfeasance, Henley brings claims against defendants for breach of contract, tortious interference, unjust enrichment and Chapter 93A violations.

### JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. §1332.

2. Venue is proper pursuant to 28 U.S.C. §1391.

## PARTIES

3. Henley is a Massachusetts corporation with a principal place of business at 8A Pleasant Street South Suite 100, Natick, Massachusetts.

4. Defendant A&C Ventures, Inc. ("Ventures") is a Delaware corporation with a principal place of business at 465 First Street West, 2nd Floor, Sonoma, California. Ventures is a real estate development company that owns and controls a number of single purpose limited liability companies ("Shell LLCs").

5. Defendant HD Westminster, LLC ("HD") is a Nevada limited liability company with a principal place of business at 465 First Street West, 2nd Floor, Sonoma, California. HD is Shell LLC that is owned and controlled by Ventures. Upon information and belief, HD was named after the investment for which it was created to hold - - a Home Depot store located in Westminster Colorado.

6. Defendant ATT Avon, LLC ("Avon") is a Nevada limited liability company with a principal place of business at 465 First Street West, 2nd Floor, Sonoma, California. Avon is a Shell LLC that is owned and controlled by Ventures.

7. Defendant David R. Grieve ("Grieve") is the President and Chief Executive Officer of Ventures, the Manager for Avon, and the Manager for HD.

## FACTS

**The Business of Henley**

8. Henley is a boutique consulting firm located in Natick, Massachusetts that advises clients on matters relating to Commercial Mortgage Backed Securities ("CMBS"). Specifically, Henley is frequently retained to help restructure commercial debt on real estate and/or arrange

for "short sales" (*i.e.,* a sale where the lender accepts less than the full amount of the debt) of distressed properties. Since 2009, Henley has advised clients on over $1.6 billion in transactions.

9. Henley was co-founded by David Goldfisher, who has extensive experience in real estate finance. Before co-founding Henley, David Goldfisher served as a CMBS loan originator and director of well-known financial institutions including Wells Fargo, Bear Stearns, and ABN AMRO/LaSalle Bank.

**The Business of Ventures**

10. Ventures is a real estate development firm that acquires, develops, and manages single-tenant retail properties throughout the United States.

11. Through its portfolio companies, Ventures leases numerous properties to national and regional retailers such as Office Depot, Payless Shoe Source, Rite Aid, and Pier 1 Imports.

12. According to its website, Ventures' current portfolio consists of over 165 properties in 33 states totaling 3.1 million square feet, valued at approximately $700 million. This portfolio includes ten properties located in Massachusetts, which Ventures leases to commercial tenants such as Rite Aid and CVS.

13. Upon information and belief, Ventures utilizes single purpose limited liability companies (Shell LLCs) to acquire and hold the properties in its portfolio. Ventures, however, maintains complete control over these Shell LLCs and conducts their operations. Additionally, Ventures' President and CEO, Grieve, is typically the Manager of the Shell LLCs.

14. The Shell LLCs include, without limitation, HD and Avon, which as described below are the entities relevant to the transaction that Henley arranged.

**The HD Westminster Property**

15. Ventures' portfolio includes a property located in Westminster Colorado that is

leased to Home Depot (the "Westminster Property").

16. The Westminster Property was leased to Home Depot in 1999 with the intention that it would become a Home Depot EXPO store. The store, however, never opened and the Westminster Property has remained vacant for over fifteen years.

17. Despite not opening its store, Home Depot has paid and continues to pay monthly rent for the Westminster Property pursuant to a lease that expires in 2018 (the "HD Lease").

18. Upon information and belief, HD acquired title to the Westminster Property in 2004 for a purchase price of $8,793,750 (plus closing costs), financed with an $8.5 million loan.

19. Upon information and belief, in December 2005, HD transferred a 70.57% interest in the property to the Shell LLC, Avon. Following that transaction, the $8.5 million loan was replaced with a $6.85 million loan (the "Loan"), on which defendant David Grieve gave a limited personal guarantee (the "Guarantee").

20. The Loan and Guarantee were subsequently pooled with other commercial loans as part of a commercial mortgage back security entitled Bank of America Commercial Mortgage, Inc., Commercial Pass-Through Certificates, Series 2006-2 (the "HD Debt").

21. Torchlight Loan Services, LLC ("Torchlight") was the special servicer for the HD Debt.

**Ventures Hires Henley To Help Restructure the HD Property Debt**

22. The Loan on the Westminster Property was set to mature in January 2016. Defendants, however, could not refinance the Property because it was vacant and the HD Lease was set to expire in 2018.

23. A foreclosure on the Westminster Property, moreover, would have significant negative tax consequences on Ventures, Avon and Grieve personally (the "Tax Consequences")

4

and a default could potentially trigger personal liability for Grieve under the Guarantee. Additionally, having the Westminster Property foreclosed upon could present difficulties to Ventures in obtaining future financings for its other deals.

24. Because of this dilemma, in February 2015, Ventures, HD and Avon hired Henley to assist them in discounting the HD Debt through a restructuring, acquisition of the Loan (*i.e.*, the note), facilitating the sale of the Westminster Property, or any other means.

25. Henley's engagement was pursuant to a written contract (the "Agreement") dated February 11, 2015. A true and accurate copy of the Agreement is attached as Exhibit A.

26. Under the Agreement, Henley was to be paid a $25,000 Engagement Fee and a Restructuring Fee equal to the greater of $30,000 or five percent (5%) of the discounted amount of the HD Debt.

27. Although the Agreement was putatively between Henley and HD, in reality, Henley represented Ventures, which owned and controlled HD and its sister Shell LLC Avon. In fact, the Agreement expressly recognizes this.

**The Short Sale Plan**

28. Henley commenced work in February 2015 and created a strategy whereby a real estate developer (Vallejo Management, LLC ("Buyer")) would buy the Westminster Property in 2015 through a short sale. That way, the Buyer could utilize the remaining rental income from Home Depot to pay the carrying cost while it secured the necessary permits and municipal approvals needed to develop the property.

29. The Buyer executed a purchase and sale agreement for the Westminster Property in early April 2015.

30. Because the deal with the buyer was structured as a "short sale" it required Torchlight's approval (*i.e.*, Torchlight had to agree to accept less than the full amount of the HD Debt).

31. Henley spearheaded the negotiations with Torchlight for defendants. As part of that negotiation, Henley prepared a comprehensive asset memorandum (the "Asset Memorandum") for Torchlight that analyzed the benefits of the proposed transaction.

32. A true and accurate copy of the April 14, 2015 Asset Memorandum is attached as Exhibit B.

33. Henley also helped negotiate a Pre-Negotiation Agreement with Torchlight that paved the way for negotiations of the short sale.

34. Despite this effort, including an executed purchase and sale agreement, on July 6, 2015, Torchlight informed Henley that it would not approve the short sale. Instead, Torchlight stated its intention to foreclose on the Westminster Property, collect the rent from Home Depot and then sell the property itself in 2018.

**Torchlight Issues a Notice of Default**

35. During the ensuing six months, Henley and defendants continued to discuss options to either restructure and/or eliminate the debt, including by giving Torchlight a deed in lieu of foreclosure. Torchlight, however, torpedoed these efforts as well.

36. The Loan on the Westminster Property came due in the beginning of January 2016. When defendants failed to pay the Loan, Torchlight issued a Notice of Default.

37. A true and accurate copy of the January 6, 2016 Notice of Default is attached as Exhibit C.

38.     On January 28, 2016, David Grieve emailed Goldfisher regarding defendants' pressing need to restructure the debt. Specifically, Grieve wrote:

> David,
> Time for you to shine. We have been notified that Torchlight will not take a "Deed in Lieu", they want to go the whole 9 yards on this Non Recourse loan. Can you please step in and help us move toward letting us just hand over the keys? Do you have any connections? I will forward you their most recent letter.
> Thanks,
> David

39.     A true and accurate copy of Grieve's January 28, 2016 email is attached as Exhibit D.

### Henley Proposes A Deal With Cremac To Solve Ventures' Problem

40.     Answering Grieve's call for help, in early 2016, Henley developed a new plan to restructure the HD Debt. Specifically, Henley knew that the HD Debt had been securitized and was subject to a "pooling agreement" between the various creditors holding the HD Debt. The controlling class bond holder in that pooling agreement had the right to purchase the HD Debt at a fair market value, which was well below the amount of the debt. In other words, the controlling class bond holder could essentially purchase the debt in a "short sale."

41.     Henley's plan was to structure a deal whereby the controlling class bond holder would purchase the HD Debt at a discount and sell it to either Ventures or a buyer for a premium that was still less than the full amount of the debt.

42.     On or about February 2, 2016, Goldfisher met with Kelly Allred (Executive Vice President and Chief Financial Officer for Ventures) at the Hyatt hotel in Orlando, Florida and pitched his proposal. Mr. Allred agreed that the plan should be pursued.

43. Using Goldfisher's industry connections, Henley determined that the controlling class bond holder was a company called Cremac Asset Management, LLC ("Cremac"). Henley knew Cremac and had a contact there named Joseph Cafiero.

44. On February 29, 2016, Ventures' Executive Vice President and General Counsel, Peter Wohlfeiler, emailed Goldfisher asking to arrange for a conference call with Cremac.

45. A true and accurate copy of Wohlfeiler's email is attached as Exhibit E.

46. A few days later, on March 1, 2016, Goldfisher spoke with Wohlfeiler on the telephone and confirmed that defendants would pay Henley its fee if a deal closed with Cremac.

47. With that confirmation, Henley set up the conference call between Ventures and Cremac to discuss a possible deal.

48. On March 3, 2016, Henley, Ventures, and Cremac had a conference call to discuss a possible deal.

49. On March 11, 2016, Ventures sent Henley materials for it to review and then forward to Cremac regarding the Westminster Property.

50. A true and accurate copy of Wohlfeiler's March 11, 2016 email to Goldfisher is attached as Exhibit F.

51. On April 5, 2016, Ventures conducted another conference call with Cremac to discuss the transactions. Following the call, Ventures emailed additional materials to Cremac regarding the Westminster Property.

52. A true and accurate copy of Wohlfeiler's April 5, 2015 email (which copies Goldfisher) is attached as Exhibit G.

**Ventures Freezes Henley Out of the Discussions With Cremac**

53.     Armed with Henley's plan and a direct line of communication with its contacts at Cremac, Ventures thereafter froze Henley out of the negotiations so that defendants could claim that no fee was due.

54.     In or around October/November 2016, Cremac purchased the HD Debt and sold it to a new Shell LLC called Colorado Note Portfolio (the "Debt Holding Shell"), which is controlled by Ventures, without notifying Henley.

55.     Through this transaction (which was designed by Henley), Ventures was able to discount the HD Debt by $3.55 million.

56.     Henley learned about the sale through an online computer database called Trepp. Thereafter, Goldfisher spoke with Wohlfeiler and stated that he expected defendants to honor the Agreement, as subsequently ratified by Wohlfeiler, and pay Henley its Restructuring fee, which equaled $177,000 (*i.e.*, 5% of the $3.55 million discount).

57.     Wohlfeiler, however, reneged and told Goldfisher that defendants would not pay the fee because Grieve thought that Henley "had been paid enough already."

58.     Following this discussion, on Oct. 31, 2016, Henley invoiced Ventures, HD, Avon, and David Grieve for its Restructuring Fee. A true and accurate copy of the invoice is attached as Exhibit H.

59.     On November 1, 2016, defendants again refused to pay the invoice - - this time proffering new excuses, including that sale from Cremac to the Debt Holding Shell did not qualify as a restructuring under the Agreement.

9

## COUNT I
### (Breach of Contract)

60. Henley repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

61. As detailed above, the Agreement is a valid and binding contract between Henley and defendants.

62. Henley fully performed under the Agreement.

63. As set forth above, defendants breached the Agreement by, among other things, failing to pay Henley the Restructuring Fee.

64. As a direct and proximate result, Henley has suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and consequential damages.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

65. Henley repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

66. Defendants' conduct outlined above violated the covenant of good faith and fair dealing contained in the Agreement.

67. As a direct and proximate result, Henley has suffered damages in an amount to be proven at trial.

## COUNT III
### (Promissory Estoppel)

68. Henley repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

69. On March 1, 2016, Ventures' Executive Vice President and General Counsel,

Peter Wohlfeiler, promised Henley that defendants would pay Henley its fee on a deal with Cremac.

70. Henley reasonably relied on that promise to its detriment.

71. Defendants breached their promise to Henley.

72. As direct and proximate result, Henley suffered damages in an amount to be proven at trial.

## COUNT IV
### (Unjust Enrichment)

73. Henley repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

74. Defendant David Grieve personally benefitted from Henley's work.

75. This personal benefit included without limitation the cancellation of the Guarantee and several tax benefits.

76. Likewise, the corporate defendants benefited through the loan reduction and other financial and tax benefits.

77. As a result of Henley's efforts, the defendants have been unjustly enriched, and must pay Henley for the fair value of its services.

## COUNT V
### (Violation of Ch. 93A §11)

78. Henley repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

79. Both plaintiff and defendants engage in the conduct of trade or commerce.

80. As described above, defendants engaged in unfair and deceptive conduct.

11

81. David Grieve personally participated in and directed these unfair and deceptive actions.

82. Defendants' unfair and deceptive conduct was knowing and willful.

83. Defendants' unfair and deceptive actions occurred primarily and substantially with in the Commonwealth, including the delivery into the Commonwealth of all the communications set forth herein.

84. As a result of defendants' misconduct, Henley has suffered damages in an amount to be proven at trial.

## **PRAYERS FOR RELIEF**

WHEREFORE, Henley respectfully requests that the Court:

A. After a trial on the merits, enter judgment in favor of Plaintiff on all Counts of the Complaint.

B. Award Plaintiff multiple damages, and attorney fees pursuant to M.G.L. ch. 93A.

C. Award Plaintiff prejudgment interest and costs.

D. Award such other relief as is deemed just and equitable.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

The Henley Group, Inc.

By its attorneys,

/s/ Dana A. Zakarian
William C. Nystrom BBO#559656
Dana A. Zakarian BBO# 641058
Nystrom Beckman & Paris LLP
One Marina Park Drive, 15th Floor
Boston, MA  02110
(617) 778-9100
(617) 778-9110 (fax)
wnystrom@nbparis.com
dzakarian@nbparis.com

DATED:  January 4, 2017